JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Ottis McCrary, et al.

**DEFENDANTS**
Lannett Company, Inc., Impax Laboratories, Inc., West-Ward Pharmaceuticals Corporation, Actavis plc, Mylan Pharmaceuticals, Inc., Endo International plc, Sun Pharmaceutical Industries, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff    Jackson County, AL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Krishna Narine, Meredith & Narine, 100 S. Broad St., Suite 905, Philadelphia, PA. 19110 (215) 564-5182

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☒ 3   Federal Question
     *(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☐ 4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | |    28 USC 157 | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted |    Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark |    Corrupt Organizations |
|    Student Loans | ☐ 340 Marine |    Injury Product | | | ☐ 480 Consumer Credit |
|    (Excludes Veterans) | ☐ 345 Marine Product |    Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud |    Act | ☐ 862 Black Lung (923) |    Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract |    Product Liability | ☐ 380 Other Personal |    Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - |    Product Liability |    Leave Act | |    Act |
| |    Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** |    Income Security Act | ☐ 870 Taxes (U.S. Plaintiff |    Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | |    or Defendant) |    Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |    Sentence | |    26 USC 7609 |    State Statutes |
| ☐ 245 Tort Product Liability |    Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |    Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other | ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. Section 1
Brief description of cause:
Antitrust price-fixing conspiracy in violation of the Sherman Act and related state law.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE   Hon. Cynthia M. Rufe    DOCKET NUMBER 2:16-cv-00990-CMR

DATE 6/17/16

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |  |
|---|---|---|
| Ottis McCrary, et al. | : | CIVIL ACTION |
| v. | : | |
| Lannett Company, Inc., et al. | : | |
|  | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)          (X )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( )


_6/17/16_          _____          Plaintiff
**Date**          **Attorney-at-law**          **Attorney for**

_(215) 564-5182_          _(267) 697-1628_          _knarine@m-npartners.com_

**Telephone**          **FAX Number**          **E-Mail Address**


(Civ. 660) 10/02

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: __Ottis McCrary, 3371 County Road 54, Stevenson, AL  35772__

Address of Defendant: __See Exhibit A__

Place of Accident, Incident or Transaction: __Throughout the United States__
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes☐  No☒

Does this case involve multidistrict litigation possibilities?     Yes☒  No☐

*RELATED CASE, IF ANY:*

Case Number: __2:16-cv-00990-CMR__   Judge __Hon. Cynthia M. Rufe__   Date Terminated: __N/A__

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☒   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

**A.** *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☒ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify) _____

**B.** *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, __Krishna B. Narine__, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: __6/17/16__   _____   __PA 52238__
                     Attorney-at-Law            Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____   _____   _____
                        Attorney-at-Law            Attorney I.D.#

CIV. 609 (5/2012)

**EXHIBIT A TO DESIGNATION FORM - DEFENDANTS' ADDRESSES**

Lannett Company, Inc.
9000 State Road
Philadelphia, PA 19136

Impax Laboratories, Inc.
3735 Castor Avenue
Philadelphia, PA 19124

West-Ward Pharmaceuticals Corp.
401 Industrial Way
Eatontown, NJ 07724

Actavis, plc
400 Interplace Parkway
Parsippany, NJ 07054

Mylan Pharmaceuticals, Inc.
110 Allen Road
Basking Ridge, NJ 07920

Endo International, plc
1400 Atwater Dr.
Malvern, PA 19355

Sun Pharmaceutical Industries, Inc.
270 Prospect Plains Rd.
Cranbury, NJ 08512

PAR Pharmaceutical Companies, Inc.
300 Tice Boulevard
Woodcliff Lake, NJ 07677

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Ottis McCrary, on behalf of himself and all others similarly situated,** | Case No. |
| **Plaintiffs** | |
| **v.** | **CLASS ACTION COMPLAINT** |
| **Lannett Company, Inc., Impax Laboratories, Inc., West-Ward Pharmaceuticals Corporation, Actavis plc, Mylan Pharmaceuticals, Inc., Endo International plc, Sun Pharmaceutical Industries, Inc.,  and Par Pharmaceutical Companies, Inc.,** | **DEMAND FOR JURY TRIAL** |
| **Defendants** | |

## INTRODUCTION

1.     Plaintiff Ottis McCrary ("McCrary" or "Plaintiff") brings this action both individually and on behalf of (a) a national injunctive class of persons or entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price of generic digoxin or doxycycline products manufactured by Defendants during the period from October 1, 2012 to the present and (b) a damage class of persons or entities in the purchased, paid and/or provided reimbursement for some or all of the purchase price of generic digoxin or doxycycline products manufactured by Defendants during the period from October 1, 2012 to the present in the 31 states identified herein and the District of Columbia.  Defendants are accused of engaging in a conspiracy to fix, maintain, and/or stabilize the prices of these generic drug products. All allegations herein are based on information and belief, except for those relating to the Plaintiff.

1

2.      The claims in this case arise from a broad conspiracy among manufacturers of generic drugs to fix the prices charged for those drugs in recent years. The conspiracy appears to have been effectuated by direct company-to-company contacts among generic drug manufacturers, as well as joint activities undertaken through trade associations such as the Generic Pharmaceutical Association ("GPHA"). The unlawful acts undertaken with respect to generic digoxin and doxycycline are merely two manifestations of that overall conspiracy. The Antitrust Division of the United States Department of Justice ("DOJ") commenced in 2014 a wide-ranging criminal investigation of this broad conspiracy and has caused grand jury subpoenas to be issued to various Defendants in connection with this investigation. The investigation encompasses generic drugs other than digoxin and doxycycline and, as the scope of the DOJ's investigation is further clarified, Plaintiff reserves the right to amend its complaint to add more parties and/or claims. According to a June 26, 2015 report by the service Policy and Regulatory Report ("PaRR Report") (available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf):

> A PaRR source says prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."

3.      The entire purpose of permitting a generic drug industry in the United States was to encourage the manufacture of less expensive, non-branded substitutes for branded prescription drugs that either had no patent exclusivity or for which the patent exclusivity was expiring. According to a March 12, 2015 Powerpoint presentation by Defendant Lannett Company, Inc., eight out of ten prescriptions are filled for generic drugs.  According to that presentation, this is because the United States healthcare system focuses on "cost saving", thereby "increasing

demand for cheaper generic drugs."[1] In a January 2012 report, the Government Accounting Office noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[2]

4.     As reflected in a chart compiled by Representative Elijah E. Cummings ("Cummings"), Ranking Member of the House Committee on Oversight and Government Reform and Senator Bernie Sanders ("Sanders"), Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, prices for certain generic drugs, including digoxin and doxycycline, increased dramatically in 2013:[3]

---

[1] https://www.business.illinois.edu/finance/rcmp/research/LCI2015-3.pptx.

[2] http://www.gao.gov/assets/590/588064.pdf.

[3] http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file

| Drug | Use | Average Market Price Oct. 2013 | Average Market Price April 2014 | Average Percentage Increase |
|---|---|---|---|---|
| Doxycycline Hyclate (bottle of 500, 100 mg tablets) | antibiotic used to treat a variety of infections | $20 | $1,849 | 8,281% |
| Albuterol Sulfate (bottle of 100, 2 mg tablets) | used to treat asthma and other lung conditions | $11 | $434 | 4,014% |
| Glycopyrrolate (box of 10 0.2 mg/mL, 20 mL vials) | used to prevent irregular heartbeats during surgery | $65 | $1,277 | 2,728% |
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | used to prevent migraines and treat certain types of seizures | $31 | $234 | 736% |
| Pravastatin Sodium (bottle of 500, 10 mg tablets) | used to treat high cholesterol and to prevent heart disease | $27 | $196 | 573% |
| Neostigmine Methylsulfate (box of 10 1:1000 vials) | used in anesthesia to reverse the effects of some muscle relaxants | $25 | $121 | 522% |
| Benazepril/Hydrochlorothiazide (bottle of 100, 20-25 mg tablets) | used to treat high blood pressure | $34 | $149 | 420% |
| Drug | Use | Average Market Price Nov. 2012 | Average Market Price Sept. 2014 | Average Percentage Increase |
| Isuprel (box of 25, 0.2 mg/mL vials) | used to treat heart attacks and irregular heartbeat | $916 | $4,489 | 390% |
| Nitropress (50 mg vial) | used to treat congestive heart failure and reduce blood pressure | $44 | $215 | 388% |
| Drug | Use | Average Market Price Oct. 2012 | Average Market Price June 2014 | Average Percentage Increase |
| Digoxin (single tablet, 250 mcg) | used to treat irregular heartbeats and heart failure | $0.11 | $1.10 | 884% |

5.     Digoxin is used to treat mild to moderate heart failure in adults, increase the heart contracting functions for pediatric patients with heart failure, and control the resting heart rate in adult patients with chronic atrial fibrillation.[4]   It is derived from the leaves of a digitalis (or foxglove) plant and was first described in medical literature around 1785.   Digoxin helps an injured or weakened heart pump blood more efficiently and strengthens the force of the heart muscle, which helps to restore a normal, steady heart rhythm.   It is on the World Health

_____

[4] As used herein, the term "digoxin" is intended to refer to doses of digoxin taken orally in the form of a tablet or capsule.

Organization's ("WHO") list of essential medicines.[5] Digoxin must be taken daily and exactly as prescribed to be effective. Failure to take digoxin as prescribed can have catastrophic consequences. According to data from IMS Health, annual sales of digoxin in the United States are approximately $44 million as of the beginning of 2014. As indicated in the discussion below, those sales numbers increased dramatically in 2014 and 2015.

6.      Doxycycline monohydrate is an antibiotic used in treating humans and animals. It is useful for bacterial pneumonia, acne, chlamydia infections, *Clostridium difficile* colitis, early Lyme disease, cholera and syphilis. It is also useful for the treatment of malaria when used with quinine and for the prevention of malaria. It came into use in 1967 and is also on WHO's list of essential medicines referenced above. Doxycycline hyclate is a variation of doxycycline monohydrate that entered the market in 1985. As used herein, the term "doxycycline" refers to both doxycycline monohydrate and doxycycline hyclate in tablet or capsule form, unless otherwise indicated.

7.      The price increases described above endanger human lives. Many patients with cardiovascular conditions need to take digoxin daily in order to survive. Likewise, people with serious infections or other life-threatening diseases need access to a ready, affordable supply of doxycycline. Many have limited ability to cope with these types of price hikes.

8.      Defendants Lannett Company, Inc. ("Lannett"), Impax Laboratories, Inc. ("Impax"), West-Ward Pharmaceuticals Corp. ("West-Ward"), Mylan Pharmaceuticals, Inc.

---

[5] *See*
http://www.who.int/selection_medicines/committees/expert/20/EML_2015_FINAL_amended_AUG2015.pdf?ua=1.

5

("Mylan"), Sun Pharmaceutical Industries, Inc. ("Sun"),[6] and Par Pharmaceutical Companies, Inc. ("Par") are manufacturers and/or distributors of generic digoxin. These Defendants collectively sell tens of millions of dollars worth of digoxin every year in the United States. Lannett, Impax, West-Ward, Par, Sun, Mylan, and Endo International plc ("Endo") are also manufacturers and/or distributors of generic doxycycline. Another major supplier of generic doxycycline has been Actavis plc ("Actavis").[7] On March 17, 2015, Actavis completed its acquisition of Allergan, Inc. ("Allergan") in a cash and equity transaction valued at approximately $70.5 billion.

9.      The markets for generic digoxin and generic doxycycline are oligopolies. Thus, in the generic digoxin market, mergers and withdrawals from the market caused the number of competitors to shrink drastically. By October of 2013, the generic digoxin market was essentially a duopoly controlled by Lannett and Impax. Defendant West-Ward, a subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), is also a competitor, but it had to suspend operations in November of 2012 in the wake of an investigation by the United States Food & Drug Administration ("FDA") into production problems at its manufacturing facility. It resumed participation in the generic digoxin market in July of 2013. Similarly, Sun's subsidiary Caraco

---

[6] Digoxin supplied by Sun was manufactured in the Detroit facility of Sun's subsidiary, Caraco Pharmaceutical Laboratories, Ltd.  ("Caraco"), until approximately June of 2014 when Caraco shut down its Detroit facility. *See* http://www.crainsdetroit.com/article/20140502/NEWS/140509962/caraco-pharmaceutical-to-lay-off-178-close-its-detroit-plant-this. Upon information and belief, Sun resumed production and distribution of generic digoxin starting in the latter half of 2015. http://www.sunpharma.com/node/120501.

[7] http://www.allergan.com/Actavis/media/PDFDocuments/2013_US_Rx_Product_Catalog.pdf. The predecessor to Actavis also manufactured a generic form of digoxin at plants in New Jersey, but in December of 2008, it agreed to cease doing so after the DOJ sued it for violating the FDA'a manufacturing regulations. *See* http://www.law360.com/articles/81363/correction-actavis-to-halt-production-at-3-plants. The company no longer sells generic digoxin in the United States.

also suspended operations of its Michigan facilities around June of 2009 due to manufacturing problems.[8] Production resumed in August of 2012.[9]  Mylan and Par entered that market in 2014 and 2015, respectively.  Arthur Bedrosian ("Bedrosian"), the CEO of Lannett, calls these companies "rational" competitors. Similarly, Par, West-Ward, Mylan, Sun, Endo, Actavis and Lannett are also major players in the market for generic doxycycline.

10.   Defendants' dramatic and unexplained price hikes have engendered extensive scrutiny by the United States Congress and by federal and state antitrust regulators. In a January 8, 2014 letter to members of key committees of the United States House of Representatives and Senate, Douglas P. Hoey, Chief Executive Officer of the National Community Pharmacists' Association, asked Congress to conduct an investigation of generic drug price increases.[10] On October 2, 2014, Sanders and Cummings sent letters to Actavis, Endo, Lannett, Par, Sun, Impax, Mylan, and West-Ward ("October Letters") asking for detailed information on the generic digoxin and/or generic doxycycline hyclate price hikes, among others.[11]

11.   On November 20, 2014, Sanders's committee held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?" ("Senate Hearing"). Various witnesses discussed the price hikes for generic drugs. Although Bedrosian, the CEO of Lannett, was invited to testify, neither he nor any other chief executive of a generic drug manufacturer did so.[12]

---

[8] *See* https://www.ihs.com/country-industry-forecasting.html?ID=106595376

[9] *See* http://www.bloomberg.com/news/articles/2013-10-28/sun-says-it-addressed-fda-observations-at-caraco-factory-1-

[10] https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf.

[11] The October Letters may be found at http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[12] http://www.sanders.senate.gov/newsroom/press-releases/drugmakers-mum-on-huge-price-hikes.

12.     Industry analysts have also questioned manufacturers' claims that price increases are due to supply disruptions.  Indeed, Richard Evans at Sector & Sovereign Research recently wrote:   "[a] plausible explanation [for price increases of generic drugs, including generic digoxin] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation." [13]

13.     Antitrust regulators have also been actively investigating the price hikes. In August of 2014, the Connecticut Attorney General ("AG") opened an antitrust investigation into digoxin pricing.  Lannett, Impax and Par were subpoenaed concerning a conspiracy to restrain trade by fixing the price of digoxin or allocating and dividing customers or territories. A copy of the subpoena issued to Lannett is attached hereto as Exhibit A and confirms that digoxin pricing is at the heart of the investigation. Par reported that it completed its "response" to the Connecticut AG on October 28, 2014. More recently, Endo also disclosed that in December of 2016, it received a subpoena and interrogatories from the Connecticut AG that requested information concerning the pricing of its generic products, including doxycycline.

14.     By November 3, 2014, as noted above, the DOJ opened a criminal grand jury investigation into the pricing of various generic drugs, including generic digoxin and generic doxycycline.  To date, according to statements in public filings with the Securities & Exchange Commission ("SEC") discussed below, the grand jury has issued subpoenas to Lannett and Lannett's Vice-President of Sales and Marketing (believed to be Kevin Smith ("Smith"),

---

[13] http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

according to Lannett's website (http://www.lannett.com/about-lannett-management.php); Impax and an unidentified sales representative of Impax; Actavis; Par; Sun; and Mylan.

16. Plaintiff alleges that during the Class Period, Defendants conspired, combined and contracted to fix, raise, maintain and stabilize prices at which generic digoxin and generic doxycycline would be sold.  As a result of Defendants' unlawful conduct, Plaintiff and the other members of the proposed Classes paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for generic digoxin and generic doxycycline.

## JURISDICTION AND VENUE

16. Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

17. This action is also instituted under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in Counts Two through Four below.

18. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. §26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. §§ 1367.

19. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C  § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  Venue is also proper in this District because the federal grand jury investigating the pricing of generic

drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here, where Lannett, Endo and Mylan are headquartered and where Impax's generics division, Global Pharmaceuticals ("Global"), is located.

20.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold digoxin throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## **PLAINTIFF**

21.     Plaintiff McCrary is a resident of Stevenson, Alabama. McCrary purchased generic doxycycline manufactured by one or more of the Defendants. As a result of the alleged conspiracy, Plaintiff was injured in his business or property by reason of the violations of law alleged herein.

22.     Lannett is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania.  Lannett is a distributor of generic digoxin and generic doxycycline. During the Class Period, Lannett sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

23.     Impax is a Delaware corporation that has its principal place of business in Hayward, California.   As noted above, Impax's generics division is called Global Pharmaceuticals ("Global") and is a manufacturer and distributor of generic digoxin.  During the Class Period, Global sold generic digoxin to customers in this District and other locations in the United States.

10

24.     Par is a Delaware corporation with its principal place of business in Chestnut Ridge, New York.  In January of 2014, Par announced that it had entered into an exclusive United States supply and distribution agreement with Covis Pharma S.à.r.l. ("Covis") to distribute the authorized generic version of Covis's Lanoxin® (digoxin) tablets. At that time, Par began selling and shipping 0.125 mg and 0.250 mg strengths of digoxin tablets in this country. Par also manufactures generic doxycycline. During the Class Period, Par sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

25.     West-Ward is a Delaware corporation with its principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC ("Hikma"), a London-based global pharmaceutical company and is a manufacturer and distributor of generic digoxin. During the Class Period, West-Ward sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

26.     Actavis is an Irish corporation that has its global headquarters in Dublin, Ireland and its administrative headquarters in Parsippany-Troy Hills, New Jersey. During the Class Period, Actavis sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

27.     Mylan is a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania. During the Class Period, Mylan sold generic digoxin and generic doxycycline to customers in this District and other locations in the United States.

28.     Sun is a Delaware corporation with its principal place of business in Cranbury, New Jersey. Sun is the United States agent and subsidiary of Sun Pharmaceutical Industrial, Ltd., a global pharmaceutical company based in India. During the Class Period, Sun sold generic

digoxin and generic doxycycline to customers in this District and other locations in the United States.

29.     Endo is an Irish corporation with its global headquarters in Dublin, Ireland and its administrative headquarters in Malvern, Pennsylvania. During the Class Period, Endo sold generic doxycycline to customers in this District and other locations in the United States.

30.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

31.     All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

32.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

33.     At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

34.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

35.     During the Class Period, Defendants sold substantial quantities of generic digoxin and/or generic doxycycline in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

## FACTUAL ALLEGATIONS

### The Industry

36.     Defendants manufacture and sell, *inter alia*, generic versions of a branded drug once the patent on the branded drug expires.

37.     According to the FDA's Glossary, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use." [14] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product." *Id.*  According to a Powerpoint presentation given by Lannett at the 2014 Bank of America/Merrill Lynch Healthcare Conference, the cost of generics is "[o]ften 80-85% less than the brand*."*

38.     Due to the price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute the generic drug when presented with a prescription for the branded drug. Since passage of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 68b-68c, 70b; 21 U.S.C. §§ 301 note, 355, 360cc; 28 U.S.C. § 2201; 35 U.S.C. §§ 156, 271, 282)), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic

---

[14] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

### Market for Generic Digoxin

39.     The market for generic digoxin is mature and the Defendants in that market can only gain market share by competing on price.

40.     Lanoxin® is a branded version of digoxin. It was formerly a registered trademark of GlaxoSmithKline ("GSK"), which in December of 2011 sold its commercial rights in Lanoxin to Covis.  Currently, Lanoxin® is manufactured by DSM Pharmaceuticals, Inc. and distributed by Covis. As noted above, in January of 2014, Par contracted with Covis for distribution rights for an authorized generic version of Lanoxin® in the United States.

41.     According to the 2015 edition of the FDA's Orange Book, the .250 mg strength of Lanoxin® is a reference listed drug ("RLD"). An RLD is an "approved drug product to which new generic versions are compared to show that they are bioequivalent," that is, the generic version "performs in the same manner as the Reference Listed Drug." FDA's Glossary, available at  http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#RLD.  A drug company seeking approval to market a generic equivalent must refer to the Reference Listed Drug in its Abbreviated New Drug Application (ANDA)." *Id.* Once the FDA determines that a drug company's application contains sufficient scientific evidence establishing the bioequivalence of the product to the RLD, an applicant may manufacture and market the generic drug product to provide a safe, effective, low cost alternative to the American public. *Id.*

14

42.     Furthermore, the FDA will generally assign a Therapeutic Equivalence Code ("TE Code") of AB to those products it finds to be bioequivalent.[15] This coding system allows users to quickly determine important information about the drug product in question.[16] For example, the FDA states that "[p]roducts generally will be coded AB if a study is submitted demonstrating bioequivalence. Even though drug products of distributors and/or repackagers are not included in the List, they are considered therapeutically equivalent to the application holder's drug product if the application holder's drug product is rated AB."[17].

43.     Lanoxin® in tablet form has TE Code of "AB." As the FDA has listed in its Orange Book with regard to Therapeutic Equivalents for Lanoxin®, current generic equivalents which share the code AB are those distributed by Lannett; Global, a division of Impax; West-Ward; Par; Mylan; and Caraco, which is a subsidiary of Sun.

44.     According to its Form 10-K filed with the United States Securities & Exchange Commission ("SEC") on August 27, 2015,[18] Lannett has been involved in the business of generic digoxin distribution since at least March of 2004.   In March of 2004, Lannett entered into a supply agreement with Jerome Stevens Pharmaceuticals ("JSP") for the exclusive distribution rights in the United States to generic digoxin and two other drugs manufactured by JSP. As reflected in the aforementioned Form 10-K, this agreement was made in exchange for four million shares of Lannett's common stock. Lannett and JSP thereafter amended the original agreement to extend the initial contract for five more years (until March of 2019). As further

---

[15]http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[16] http://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#TEC.

[17]http://www.fda.gov/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/ElectronicSubmissions/DataStandardsManualmonographs/ucm071713.htm.

[18] http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm

reflected in the aforementioned Form 10-K, for additional consideration, Lannett issued to JSP 1.5 million shares of Lannett common stock, valued at approximately $20.1 million.

45.        Lannett markets and distributes two potencies of generic digoxin: 0.125 mg and 0.250 mg. They both have a TE Code of AB and therefore are generic equivalents to the corresponding respective strengths of Lanoxin®. As reflected in SEC Form 10-Ks from 2007-14, Lannett's sales of generic digoxin totaled $12.4 million in 2011; $10.9 million in 2012; $11.7 million in 2013; and $54.7 million in the 2014 fiscal year.

46.        By October of 2013, the generic digoxin market was essentially a duopoly controlled by Lannett and Impax. Defendant West-Ward was also a competitor, but it had to suspend operations in November of 2012 in the wake of an investigation by the FDA into production problems at its manufacturing facility.[19] It resumed participation in the generic digoxin market in July of 2013 after Hikma spent $39 million in remediation efforts. As noted above, Defendant Sun's subsidiary Caraco operated a plant in Detroit, Michigan that manufactured, *inter alia*, generic digoxin. The Detroit facility halted operations in June of 2009 due to violations of the FDA's manufacturing requirements.[20] Upon undergoing updates, the facility resumed production in August of 2012.[21] On or around June 30, 2014, Caraco closed its Detroit facility, stating that it has "*undertaken necessary measures to ensure business continuity of these products by transferring the production of these drugs to [its] other units.*" (italics in

---

[19] On February 12, 2012, the FDA sent a warning letter to West-Ward over managing and testing issues that caused its generic digoxin tablets to fail to be in compliance with current good manufacturing practices as defined in 21 C.F.R. Parts 210-11. *See* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2012/ucm291643.htm.

[20] *See* https://www.ihs.com/country-industry-forecasting.html?ID=106595376.

[21] *See* http://www.fiercepharma.com/pharma/sun-closing-caraco-plant-detroit-and-whacking-nearly-180-jobs.

original).[22] Upon information and belief, Sun resumed manufacturing and distributing generic digoxin in the latter half of the year 2015.[23]

**Market for Generic Doxycycline**

47.     The market for generic doxycycline is mature and the Defendants in that market can only gain market share by competing on price.

48.     The primary actors in that market are Actavis, Lannett, Par, West-Ward, Sun, Endo and Mylan, who collectively control a commanding market share.

49.     As with generic digoxin, generic doxycycline hyclate in capsule form almost universally has a TE Code of AB and the RLD is Pfizer's Vibramycin®. Doxycyline monohydrate in capsule or tablet form also almost universally has a TE Code and its RLD is listed as a generic form of the drug.

50.     Total United States retail sales of doxycycline in 2013 were estimated to be over $972 million.[24]

**Defendants' Pricing Conduct For Generic Digoxin And The Effects Thereof**

51.     Generic digoxin pricing was remarkably stable until approximately mid-October of 2013. That stability is reflected in the following chart submitted by Dr. Stephen Schondelmeyer ("Schondelmeyer"), Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony at the Senate Hearing.[25]

---

[22] http://www.in-pharmatechnologist.com/Processing/Sun-Pharma-to-shutter-Detroit-MI-plant-179-jobs-affected.

[23] *See* http://www.sunpharma.com/node/120501.
[24] http://www.drugs.com/stats/doxycycline.

[25] That testimony is available at http://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf.



Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy: (January 1, 2005 to December 31, 2013)

The terms "AWP" and "WAC" in this chart refer, respectively, to "Average Wholesale Price" and "Wholesale Acquisition Price." Both prices are referred to by Schondelmeyer as benchmark prices.[26]

52.     This chart reflects only a portion of the price hikes for generic digoxin that occurred. The October Letters referenced above noted that prices for generic digoxin had increased dramatically between October of 2012 and June of 2014 for the market as a whole:

---

[26] *Id.* at 15.

| Drug | SKU | Average Market Price, October 2012 | Average Market Price, June 2014 | Cost Increase | Average Percentage Increase |
|---|---|---|---|---|---|
| Digoxin | 125mcg tablet | $.11 | $1.06 | $0.95 | 839% |
| Digoxin | 250mcg tablet | $.11 | $1.10 | $0.99 | 884% |

53.    These astounding price increases were caused by sudden and abrupt pricing changes made by Lannett, West-Ward, Sun, and Impax that were followed by Par and Mylan when they entered the market in 2014 and 2015, respectively. In or about November and December of 2013, pricing for .125 mg and .250 mg tablets of digoxin increased more than 750%, from $.11 and $.12 per tablet to $.91 and $1.01 per tablet.  Between December of 2013 and January of 2014, the prices of digoxin jumped again to $1.08 and $1.11 per tablet.  Daily heart medication that cost 11 or 12 cents per pill in early November of 2013 cost nearly ten times more by early January of 2014.

54.    Data from the National Average Drug Acquisition Cost ("NADAC") on generic digoxin show price increases that led to identical prices for Lannett's, West-Ward's, Sun's, and Impax's generic digoxin products. The same was true of Par's pricing of generic digoxin in the United States beginning in early 2014 and of Mylan's pricing of generic digoxin when it entered the market in 2015. The following chart shows Lannett's, West-Ward's, Sun's, Impax's, Par's and Mylan's pricing of the 0.125 mg tablet dosage of generic digoxin during the period from October of 2012 to April of 2015.



55.    The following chart, based on NADAC data, shows Lannett's, West-Ward's, Sun's, Impax's, Par's and Mylan's pricing of the 0.250 mg tablet dosage of generic digoxin during the period from October of 2012 to mid-March of 2015.



56.     There were no reasonable justifications for this abrupt shift in pricing conduct.

57.     Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage.[27] No supply disruption was reported by the relevant Defendants with respect to digoxin in the fall of 2013. As stated at the website of the Generics and Biosimilars Initiative on August 29, 2014, "[a]t the time of the price increases, the US Food and Drug Administration had reported no drug shortages, there was no new patent or new formulation and digoxin is not difficult to make. The companies have not yet provided an explanation for the price rise." [28] No explanation was presented at the Senate Hearing; as noted above, executives from Lannett, Impax and Par refused to testify.

---

[27] *See* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

[28] http://www.gabionline.net/Generics/General/Lawyers-look-at-new-price-hike-for-old-drug.

58.     The presence or absence of competitors in the marketplace also does not explain the price of generic digoxin.  From October of 2012 to around November 21, 2013, the NADAC of generic digoxin was consistently around $0.11 for the 0.125 mg tablets and between $0.11 and $0.12 for the 0.250 mg tablets. The chart presented by Schondelmeyer confirms this. This was the case even though for a portion of that period after West-Ward suspended production, Lannett and Impax were the only significant players in the market. West-Ward returned to the market in July of 2013, but pricing still remained stabilized for several months. Indeed, throughout 2012 and through September of 2013, as Schondelmeyer's chart shows, the price of generic digoxin remained steady.  Following the astronomical price increases in the fall of 2013, Par entered the market in early 2015 and Mylan entered the market in 2015.  Prices did not fall despite the *addition* of new competitors.  Pricing has remained inflated to this day.

59.     This abrupt shift in the pricing of generic digoxin has had a catastrophic effect on consumers.  Alan Katz ("Katz"), a *Bloomberg* reporter, wrote a December 12, 2013 article titled "Surprise! Generic-Drug Prices Spike" and reported:

> Bill Drilling, an owner of a pharmacy in Sioux City, Iowa, apologizes as he rings up a customer's three-month supply of the heart medicine digoxin. The total is $113.12—almost 10 times the cost for the same prescription in August. Digoxin isn't a new miracle drug. . . . "I've been doing this since 1985, and the only direction that generics-drug prices have gone is down," Drilling says.
>
> ***
>
> "This is starting to create hardship," he says. Many of his customers fall into what is known as the Medicare "doughnut hole," a coverage gap in which patients pay 47.5 percent of branded-drug costs and 79 percent of a generic's price. Russ Clifford, a retired music teacher, learned digoxin's cost had jumped more than fourfold when he picked up his 30-day supply in

22

mid-November. Clifford and his wife have had to dip into savings to pay their rising pharmaceutical bills.[29]

60.    As further noted in the October Letters:

> This dramatic increase in generic drug prices results in decreased access for patients. According to the National Community Pharmacists Association (NCPA), a 2013 member survey found that pharmacists across the country "have seen huge upswings in generic drug prices that are hurting patients and pharmacies ability to operate" and "77% of pharmacists reported 26 or more instances over the past six months of a large upswing in a generic drug's acquisition price." These price increases have a direct impact on patients' ability to purchase their needed medications. The NCPA survey found that "pharmacists reported patients declining their medication due to increased co-pays," and "84% of pharmacists said that the acquisition price/lagging reimbursement trend is having a 'very significant' impact on their ability to remain in business to continue serving patients." (Footnotes omitted).

61.    Independent pharmacist Robert Frankil ("Frankil") illustrated the hardship caused by the digoxin price increases with this anecdote offered at the Senate Hearing:

> A recent example from my own experience is the price of Digoxin—a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to pay for this drug when he was in the Medicare Part D coverage gap in 2014. Last year, when in the coverage gap he paid the old price. This year he paid the new price. Needless to say, the patient was astounded, and thought I was overcharging him. The patient called all around to try to get the medicine at the old, lower price, but to no avail. This caused him lots of stress and time, and caused us lots of stress and time in explaining the situation, reversing, and rebilling the claim. This example is typical of how these price spikes put consumers and pharmacists in a bad position, often grasping at straws for explanations. And all the while, everyone pays more, including the patient, the pharmacy, and the insurer (often the federal government).[30]

**Defendants' Pricing Conduct For Generic Doxycycline And The Effects Thereof**

---

[29] *See* http://www.bloomberg.com/bw/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

[30] http://www.help.senate.gov/imo/media/doc/Frankil.pdf.

62.    For generic doxycycline, the pattern of huge price increases started in the fall of 2012, a year earlier than for generic digoxin.

63.    Schondelmeyer, in his testimony at the Senate Hearing, presented the following chart showing the sudden increase in West-Ward's pricing for generic doxycycline the AWP of which went from under $2.50 for a day of therapy for 100mg capsules of doxycycline hyclate to over $11 by January of 2013:



64.    Similarly, Sanders and Cummings noted huge increases in the price of generic doxycycline in their October Letters:

| Drug | SKU | Average Market Price October 2013 | Average Market Price April 2014 | Cost Increase | Average Percentage Increase |
|---|---|---|---|---|---|
| Doxycycline Hyclate | bottle of 50, 100mg capsules | $4 | $191 | $187 | 5,025% |
| Doxycycline Hyclate | bottle of 50, 100mg tablets | $3 | $191 | $187 | 4,986% |
| Doxycycline Hyclate | bottle of 50, 50mg capsules | $3 | $70 | $67 | 2,191% |
| Doxycycline Hyclate | bottle of 500, 100mg capsules | $27 | $1,849 | $1,822 | 7,105% |
| Doxycycline Hyclate | bottle of 500, 100mg tablets | $20 | $1,849 | $1,829 | 8,281% |

65.     The NADAC data for 50 mg and 100 mg of generic doxycycline hyclate capsules manufactured and/or distributed by Defendants Actavis, West-Ward, Sun,[31] and Endo[32] reveals a similar pattern:

---

[31] In December of 2012, which was right before doxycycline's price hike, Sun acquired URL Pharma, Inc. ("URL"), which manufactures doxycycline through its generic drug arm called Mutual Pharmaceutical Co. *See* http://www.thehindubusinessline.com/companies/sun-pharma-buys-url-generic-biz-from-takeda/article4210313.ece. In 2013, URL had nearly 20% market share in doxycycline. *See* http://articles.economictimes.indiatimes.com/2013-08-23/news/41440919_1_sun-pharmaceuticals-doxycycline-sun-pharma-shares.

[32] On August 6, 2014, Endo completed its acquisition of DAVA Pharmaceuticals, Inc. ("DAVA"), a manufacturer of generic doxycycline. http://www.prnewswire.com/news-releases/endo-completes-acquisition-of-dava-pharmaceuticals-270220501.html.





66.     Although there was some decline in prices for both dosages of doxycycline hyclate capsules, prices did not decline to the levels that existed prior to December of 2012 in this period.

67.     The NADAC data for 100mg of generic doxycycline hyclate tablets manufactured and/or distributed by Defendants Actavis, West-Ward, Sun, and Endo likewise illustrates a similar pattern:



There were no reasonable justifications for this abrupt shift in pricing conduct. The FDA did announce a shortage of doxycycline in January of 2013; but that generic drug was placed on the resolved shortage list in October of 2013.[33]

---

[33] *See* http://www.cdc.gov/std/treatment/doxycyclineShortage.htm.

68.     The NADAC data for 100mg doxycycline monohydrate tablets manufactured by
Lannett, Par and Mylan during the period from October of 2012 through mid-February of 2015 is
depicted in the following chart; while prices for this dosage reflect more of a sawtooth pattern,
again, it is one of a substantial increasing trend.



69.     These price hikes caused extreme hardship to consumers. As reported on WSMV-
TV of Nashville's website in March of 2013:

>       Many people may not recognize the name, but they have probably
>       used it for a health problem at one point.
>
>       Doctors use doxycycline to treat a wide range of issues, including
>       everything from acne to Lyme disease, anthrax exposure and even
>       heartworm in our pets.

However, the once cheap and effective drug has now dramatically gone up in price, and that has health professionals concerned.

Hospitals like Vanderbilt University Medical Center keep doxycycline in stock, but some folks worry the cure for their ailment could now be financially out of reach.

"It's a change that occurred overnight," said Vanderbilt pharmacy manager Michael O'Neil.

Not long ago, the pharmacy at Vanderbilt's hospital could purchase a 50-count bottle of 100 mg doxycycline tablets for $10, but now the same bottle costs a staggering $250.

"That's concerning to us, both as citizens and practitioners, when you see a huge increase like this in a price of a drug," O'Neil said.

Vanderbilt keeps thousands of doxycycline pills on hand in the event of a bioterrorist attack, like anthrax, and O'Neil said replacing expired pills is prohibitive.

"This one is just hurting us when we need to replace the medication," he said.

But it's the most vulnerable who are in the most jeopardy. For a pet, a heartworm diagnosis can be a death sentence without doxycycline.

Veterinarian Dr. Joshua Vaughn of the Columbia Hospital for Animals is already seeing the tragic results.

"We had one patient who we diagnosed with heartworm. We recommended heartworm treatment, but when they saw the total dollar amount, they elected not to treat the dog at all," Vaughn said.

While manufacturers say they are having problems with raw supply, many in the medical community see greed as an overriding factor.

Vaughn said he wrote a recent prescription for doxycycline that cost $77. This week, the price increased to nearly $3,000.[34]

---

[34] http://www.wsmv.com/story/21616095/sudden-increase-in-cost-of-common-drug-concerns-many.

**Lannett's Statements About Generic Drug Competition**

70.     Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.  This in itself is indicative of collusion. In addition, Defendant Lannett's own statements--in documents and in oral remarks by Bedrosian of Lannett at quarterly earnings calls with market analysts and the investigations of state and federal antitrust regulators--reinforce this inference of collusion.[35]

71.     In a fourth quarter 2013 earnings call that occurred on September 10, 2013, Bedrosian signaled Lannett's intention to increase prices and his expectations that his competitors would follow suit.  Discussing the role of Smith, one of the persons apparently subpoenaed by DOJ, Bedrosian said:

> We're not a price follower. We tend to be a price leader on price increasing and the credit goes to my sales vice president. He takes an aggressive stance towards raising prices. He understands one of his goals, his objectives as a sales vice president is to increase profit margins for the company. And he's the first step in that process….*I am finding a climate out there has been changed dramatically and I see more price increases coming from our competing—competitors than I've seen in the past. And we're going to continue to lead. We have more price increases planned for this year within our budget. And hopefully, our competitors follow suit.* (Emphases added).

72.     In a subsequent earnings call, Bedrosian reported that Lannett's chief competitor had indeed heeded its price increase signal.  In an earnings call on November 7, 2013--after the initial generic digoxin price increases--Bedrosian noted, referring to Impax, that ***"[w]e've had a recent price increase on the [generic digoxin] product as well because we are now only 1 of 2 people in the market. And as a result, I expect that product to do very well***." (Emphases added).

---

[35] http://seekingalpha.com/symbol/LCI?source=search_general&s=lci.

73.     The very next quarter, Bedrosian expressed complacency about the entry of a new competitor in the form of Par. On February 6, 2014--after more price increases on generic digoxin had occurred and after Par had entered the market--Bedrosian said he was not concerned about this new entry: "[a]nd we see Par as one of our rational competitors in the marketplace." As he went on to note, "we're not troubled by their pricing in the marketplace. Not at all."

74.     In a quarterly earnings call held on November 3, 2014. Bedrosian again expressed confidence that Lannett would not have to engage in price competition generally in the generic drug market. He said Lannett and its competitors were "*less concerned about grabbing market share. We're all interested in making a profit, not how many units we sell.*" (Emphases added). Bedrosian went on to discuss, *inter alia*, Par and Impax, saying "*the companies we're looking at here are not irrational players. I don't see them just going out and trying to grab market share.*" (Emphases added). He also noted that Mylan was expected to enter the market, "but Mylan is one of those *rational competitors, so we're not really expecting anything crazy from them*." (Emphases added). He predicted that price increases would continue.

75.     On February 4, 2015, in another quarterly earnings call, Bedrosian confirmed there would be a moratorium on price competition.  He stated: "*I think you're going to find more capital pricing [in the generic marketplace], more—I'll say less competition, in a sense. You won't have price wars*." (Emphases added). In his view, "*I just don't see the prices eroding like they did in the past*." (Emphases added).

76.     Thus, for Lannett, irrational competitors were those who competed on price in order to obtain market share. It understood that Impax, Par and Mylan, among others, were no longer interested in doing that, an understanding that could only exist if the three firms had

reached a consensus on how to price. Bedrosian's predictions bespeak that consensus. Bedrosian was also certain of reaching the same consensus with Mylan.

77.    Frederick Wilson, the CEO of Impax, also spoke to this topic in a third quarter 2014 earnings call: "we've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those…."[36]

78.    This meeting of the minds among the competing sellers of generic digoxin and generic doxycycline assured them handsome profits. Bedrosian noted in the February 4, 2015 earnings call that Lannett "recorded the highest net sales and net income in our company's history." Gross profits in the first six months of the 2015 fiscal year were $158.8 million or 76% of net sales, compared with $42.3 million or 37% of net sales during the previous fiscal year. Generic digoxin pricing played a big role in its success. The 2015 Lannett Presentation noted that generic digoxin accounted for 23% of the company's revenues. As noted in the same presentation, Lannett is highly dependent on price increases for revenue growth.

79.    Likewise, according to its 2015 SEC Form 10-K filed on February 26, 2015 (available at), Impax experienced $596 million in total revenues in the 2014 calendar year, compared to $511 million in 2013—a 17% increase. One of the primary factors in this growth was "higher sales of our Digoxin".[37]

---

[36] http://www.nasdaq.com/symbol/ipxl/call-transcripts.
[37] http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true.

## Congressional And Regulators' Responses

80.     As noted above, the unseemly profits made by the generic drug manufacturers led to inquiries by Congress and to the Senate Hearing, where numerous witnesses referenced the pricing history summarized above.

81.     Sanders and Cummings followed up on the Senate Hearing by writing a letter on February 24, 2015 to the Office of the Inspector General ("OIG") of the Department of Health & Human Services, asking it to investigate the effect price increases of generic drugs, including generic digoxin, have had on generic drug spending within the Medicare and Medicaid programs.[38] The OIG responded in a letter dated April 13, 2015, saying it planned to engage in a review of quarterly average manufacturer prices for the 200 top generic drugs from 2005 through 2014.[39]

82.     In July of 2014, George Jepsen, the Connecticut AG, issued subpoenas to Defendants Lannett, Impax and Par, specifically saying that there was "reason to believe" that a conspiracy took place "which is for the purpose, or has the effect of, (a) fixing, controlling or maintaining prices, rates, quotations, or fees; or (b) allocating or dividing customers or territories…."  This subpoena is thus not a "fishing expedition"; it is very exact, as reflected in Appendix A. In December of 2016, the Connecticut AG issued a subpoena and interrogatories to Defendant Endo requesting information regarding the pricing of a number of its generic products, including doxycycline.[40]

---

[38] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[39] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[40] *See* http://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

83.     Commencing in November of 2014, the DOJ issued grand jury subpoenas to Lannett, Impax, Par, Actavis, Mylan and, in some cases, their employees. These subpoenas have been acknowledged in SEC filings by all five companies. (It is not publicly known if West-Ward also received a subpoena, because its foreign parent, Hikma, does not make disclosures to the SEC). On May 28, 2016, Defendant Sun also disclosed that it had received a grand jury subpoena from the DOJ.[41]

84.     In an SEC Form 10-Q dated February 6, 2015, Lannett has said that on November 3, 2014, "the Senior Vice-President of Sales and Marketing was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[42]  The responses to that subpoena led to the issuance of a second grand jury subpoena to Lannett itself. It noted in the same SEC filing that on December 5, 2014, "[t]he Company was served with a grand jury subpoena related to the federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoena requests corporate documents from the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products." A report in *Pharmacy Times* described the subpoenas as follows:

> The Lannett Company, Inc, subpoena covers 2 specific areas related to antitrust laws and generic drug pricing. The first portion covers a Connecticut Attorney General investigation into whether the company or its employees engaged in price fixing, maintaining,

---

[41] *See* http://www.bseindia.com/corporates/ann.aspx?scrip=524715&dur=A&expandable=0, at May 28, 2016.

[42]

http://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=10044800&type=HTML&symbol=LCI&companyName=Lannett+Co.+Inc.&formType=10-Q&dateFiled=2015-02-06.

> or controlling for digoxin. The second portion serves the company's senior vice president of sales and marketing with a grand jury subpoena pertaining to Sherman antitrust act violations in the generic drug industry. That subpoena requests any documents exchanged with competitors related to the sale of any generic prescription medications during any time period.[43]

Similar statements are contained in Lannett's most recent SEC Form 10-Q, filed on February 9, 2016.[44]

85.     On August 27, 2015, Lannett issued a new SEC Form 10-K. It contains this further explanation of the DOJ investigation:

> In fiscal year 2015, the Company and certain affiliated individuals each were served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act. The subpoenas request corporate documents of the Company relating to corporate, financial, and employee information, communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas.[45]

Similar statements are contained in Lannett's most recent Form 10-Q, referenced above. Thus, Lannett has now indicated that the DOJ has caused subpoenas to be issued to a number of "affiliated individuals" and that the scope of the investigation extends back a decade.

86.     Similarly, in an SEC Form 10-K dated March 12, 2015, Par stated that "[o]n December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ requesting documents related to communications with competitors regarding our authorized generic version

---

[43] http://www.pharmacytimes.com/publications/issue/2014/December2014/Senate-Hearing-Investigates-Generic-Drug-Prices.

[44] http://www.sec.gov/Archives/edgar/data/57725/000110465916094983/a15-24119_110q.htm.

[45] http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

of Covis's Lanoxin® (digoxin) oral tablets."[46] Par repeated this disclosure in its Form 10-Qs issued for the second quarter of 2015.[47] In a Form 10-Q for the third quarter of 2015, Endo International plc, the parent company for Par, stated that "[o]n December 5, 2014, the Company's subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is cooperating fully with the investigation."[48]

87.     Impax's 2015 Form 10-K referenced above states that "[o]n November 3, 2014, a sales representative of the Company received a subpoena from the Justice Department's Antitrust Division requesting the production of documents to and testimony before the grand jury of the Eastern District of Pennsylvania. The request relates to any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications." Subsequently, in an SEC Form 10-Q filed on May 11, 2015, Impax indicated that the "[o]n December 5, 2014, we received a subpoena from the Antitrust Division of the DOJ

---

[46] https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[47] This filing was formerly available at the web page that follows, but has since been withdrawn: http://pr.parpharm.com/phoenix.zhtml?c=81806&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbNvbS9maWxpbmcueG1sP2lwYWdlPTEwNDIwNTIxJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

[48] http://phx.corporate-ir.net/phoenix.zhtml?c=123046&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbNvbS9maWxpbmcueG1sP2lwYWdlPTEwNTY2NjAwJkRTRVE9MCZTRVE9MCZTUURFU0M9U0VDVElPTl9FTlRJUkUmc3Vic2lkPTU3.

36

requesting documents related to communications with competitors regarding our authorized generic version of Covis's Lanoxin® (digoxin) oral tablets and our generic doxycycline products."[49] This assertion was repeated in Impax's Form 10-Q filed on August 10, 2015 and reconfirmed in its Form 10-K filed on February 22, 2016.[50]

88.     On August 6, 2015, Allergan (now part of Actavis) filed an SEC Form 10-Q, in which it disclosed that "[o]n June 25, 2015, [Actavis] received a subpoena from the U.S. Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[51] As one article noted, "[l]ike the other generic manufacturers who have been subpoenaed—Impax Laboratories, Lannett Company, and Par Pharmaceutical Companies, Inc.—Actavis has manufactured digoxin. Actavis has also supplied doxycyline, which may be significant because Par had disclosed that its DOJ subpoena sought communications related to doxycycline."[52]

89.     On December 4, 2015, Mylan N.V., the parent of Defendant Mylan, issued an SEC Form 8-K that stated "[o]n December 3, 2015, a subsidiary of Mylan N.V. … received a subpoena from the Antitrust Division of the U.S. Department of Justice … seeking information

---

[49] http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/88fbdd3c-25b3-4640-935d-4c2ced2a6a47.pdf?noexit=true.

[50] http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/0995ec20-ce96-4de1-98aa-4aacfdb675e6.pdf?noexit=true; http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/0d396bab-0306-4c61-90fe-b5cce6e02624.pdf?noexit=true.

[51] https://www.sec.gov/Archives/edgar/data/1578845/000156459015006357/agn-10q_20150630.htm.

[52] http://www.antitrustupdateblog.com/blog/doj-generic-price-fixing-investigation-targets-allergans-actavis-unit/.

relating to the marketing, pricing and sale of our generic Doxycycline products and any communications with competitors about such products."[53] Regulatory investigations against Mylan are not limited to doxycycline, however. In its SEC Form 10-K filed on February 16, 2016, Mylan N.V. reported that "[o]n December 21, 2015, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[54]

90.     On May 28, 2016, Sun's parent company, Sun Pharmaceutical Industries, Ltd., stated in a filing with the National Stock Exchange of India that "…one of the Company's U.S. subsidiaries, Sun Pharmaceutical Industries, Inc. ('SPII') has received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents from SPII and its affiliates relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters. SPII is currently responding to the subpoena." [55] As noted above., Sun is a manufacturer and/or distributor of both generic digoxin and generic doxycycline.

91.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's

---

[53] http://www.sec.gov/Archives/edgar/data/1623613/000119312515394875/d225442d8k.htm.

[54] http://files.shareholder.com/downloads/ABEA-2LQZGT/146191293x0xS1623613-16-46/1623613/filing.pdf.

[55] See http://www.bseindia.com/corporates/ann.aspx?scrip=524715&dur=A&expandable=0, at May 28, 2016.

*Antitrust Division Manual.*[56] Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id.* at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division." *Id.* "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id.* at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred." *Id.* Thus, the fact that Lannett, Impax, Actavis, Mylan, Par and Sun or their employees received federal grand jury subpoenas is a strong indicator that antitrust offenses have occurred.

92.     Commentators have also taken note of the criminal subpoenas being issued. As noted on one legal website:

> The Justice Department's subpoenas focus on sharing and exchanging of pricing information and other issues among generic drug companies. The initial subpoenas, including two senior executives, suggest that the Justice Department has specific information relating to their participation in potentially criminal conduct. It is rare for the Justice Department to open a criminal investigation with specific subpoenas for individuals, along with company-focused subpoenas.
>
> Given the breadth of such a potential cartel investigation, the Justice Department's inquiry of the generic pharmaceutical industry could be significant. The prices for a large number of generic drug prices have increased significantly over the last year.

---

[56] http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

> There does not appear to be any rational explanation for such increases involving a diverse set of products.
>
> The scope of these price increases and the timing of them certainly raise serious concerns about collusive activity among competitors.[57]

93.     Or, as Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[58]

94.     And, as another legal commentator has recently noted,

> The recent disclosure widens the DOJ's criminal probe into whether or not leading generic drug providers are colluding to artificially raise generic drug prices. According to data from the Centers for Medicare and Medicaid Services (CMS), more than half of all generic drug prices rose between June 2013 and June 2014, including 10 percent of all generic drugs doubling in price during that time. As the fourth largest generics producer in the world, at least prior to the Teva deal, Allergan is largest company to be involved in the DOJ investigation so far. The probe became public last November when Impax was served with several criminal grand jury subpoenas. Lannett announced in a regulatory filing earlier in the year that the company, as well as its senior vice-president of sales and marketing, was being served with grand jury subpoenas as well. Like Lannett, Allergan wrote that it intends to fully cooperate with the investigation. Neither the DOJ, nor the company would comment further on the investigation beyond the filings. While Allergan made no mention of the medicines involved in the suspected collusion, filings from other companies indicate that the heart drug digoxin and the antibiotic doxycycline are among those under investigation.[59]

---

[57] http://www.jdsupra.com/legalnews/criminal-global-cartel-focus-on-generic-92387/.

[58] https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[59] http://www.legalreader.com/doj-subpoenas-allergan-as-generics-antitrust-probe-widens/.

**Factors Increasing The Market's Susceptibility To Collusion**

95.     Publicly available data on the generic digoxin and doxycycline markets in the United States demonstrates that it is susceptible to cartelization by the Defendants.  Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the goods of cartel participants; (6) absence of a competitive fringe of sellers; and (7) intercompetitor contacts and communication.

96.     *Industry Concentration*. A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

97.     In the United States generic digoxin and generic doxycycline markets, the number of competitors has dwindled, creating cartel conditions. The firms that currently control most of the market are the Defendants. A graphic available at the website of one pharmacy benefits manager ("PBM")[60] reflects this development with respect to the market for generic digoxin:



98.     As the PBM goes on to explain:

---

> Overall, a grand jury is investigating the generic pharmaceutical industry as a whole for possible violations of anti-trust laws. More specifically, in early November 2014, the U.S. Department of Justice issued subpoenas to two generic drug makers seeking information about their interactions with competitors. In particular, these two companies are involved in the digoxin market, which has come in for scrutiny for obvious reasons. (Footnote omitted).

99.     The number of meaningful competitors in the generic doxycycline market is also limited largely to seven major players (four for doxycycline hyclate, three for doxycycline monohydrate), as described above.

100.    **_Barriers To Entry_**. Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

101.    Here, there are significant capital, regulatory and intellectual property barriers to entry in the generic digoxin and doxycycline markets.

102.    Par's own 2015 Form 10-K (cited above) states that its business is to develop and commercialize "generic drugs with limited competition, high barriers to entry and longer life cycles."

103.    Costs of manufacture, coupled with regulatory oversight, represent a substantial barrier to entry in both the generic digoxin and doxycycline markets. This is reflected in West-Ward's having to shut down temporarily its New Jersey production facility for digoxin and spend $39 million in remediation. Likewise, Impax's 2015 Form 10-K (cited above) referenced FDA warning letters it received with respect to its manufacturing facilities in Hayward, California and Taiwan. And the predecessor to Actavis plc's issues with the FDA over production of doxycycline at its New Jersey facilities provides another example.

104.    Intellectual property costs can also be substantial, as reflected in Par's digoxin licensing deal with Covis and Lannett's licensing arrangement with JSP.

105.    With respect to generic digoxin, entry has occurred on a limited basis, as reflected, *inter alia*, by the actions of Par and Mylan. But that entry has not curbed the price-fixing in the industry. Indeed, as noted above, Bedrosian regards both companies as "rational" competitors more interested in higher profits on fewer sales than grabbing market share through price competition.

106.    ***Demand Inelasticity***. Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  It is a measure of how demand for a product reacts to a change in price.  The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for drinking water.  In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining revenues and profits.

107.    Generic digoxin is critical to the health of patients with cardiovascular disease; it is considered a medical necessity that must be purchased at whatever cost the Defendants offer them for sale. The passages from Katz and Frankil quoted above reflect this reality. The WSMV-TV article quoted above makes a similar point as to doxycycline

108.    Thus, generic digoxin and generic doxycycline are excellent candidates for cartelization because price increases will result in more revenue, rather than less.

109.    *Lack of Substitutes*. Although there are many newer types of drugs to treat heart disease, for some patients there are no effective substitutes for digoxin; as noted above, digoxin is on the WHO's list of essential medicines. As noted above, the same is true for doxycycline and a variety of health conditions.

110.    *Standardized Product with High Degree of Interchangeability*. A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the good in question and it is easier to monitor these prices effectively.  Here, the generic digoxin and/or generic doxycycline made by the Defendant manufacturers are each chemical compounds composed of the same raw materials; indeed, Bedrosian has commented that the Defendants use many of the same suppliers.

111.    *Absence of a Competitive Fringe of Sellers*. Companies that are not part of the conspiracy can erode at conspirators' market shares by offering products at a lower, more competitive price.  This reduces revenue and makes sustaining a conspiracy more difficult.  In the market for generic digoxin, there is no realistic threat that a fringe of competitive sellers will take market share from Defendants.  The Defendants in the respective markets for generic digoxin and generic doxycycline have oligopolistic power over those markets, which facilitates their ability to raise prices without losing market share to non-conspirators.

112.    *Intercompetitor Contacts and Communications*. In order to be successful, collusive agreements require a level of trust among the conspirators. Collaboration fostered through industry associations facilitate relationships between individuals who would otherwise be predisposed to compete vigorously with each other.  Here, the Defendants are members of or

44

participants in the GPHA, which describes itself on its website as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."[61] Thus, representatives of the Defendants have opportunities to meet and conspire at functions of this group, as well as at industry healthcare meetings. In addition, as noted above, Lannett's Bedrosian has made positive assertions about how Lannett and its competitors view the competitive landscape for generic drugs, and that none of them will compete on price for the foreseeable future.  Such statements indicate intercompetitor contacts and communications. For example, around 7 months after the price of doxycycline skyrocketed in January of 2013, Defendant West-Ward's parent company Hikma, raised guidance for the drug doxycycline from $200 million to $230 million— a signal "that doxycycline prices will remain high."[62] The grand jury subpoenas discussed above lend further support to the conclusion that intercompetitor communications occurred with respect to the pricing of generic digoxin and/or doxycycline. Indeed, according to the previously-identified PaRR Report, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."

**DEFENDANTS' ANTITRUST VIOLATIONS**

113.    During the Class Period, the Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic drugs in the United States.

---

[61] http://www.gphaonline.org/about/the-gpha-association.

[62] *See* http://articles.economictimes.indiatimes.com/2013-08-23/news/41440919_1_sun-pharmaceuticals-doxycycline-sun-pharma-shares.

114.     In formulating and effectuating the contract, combination or conspiracy, the Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic digoxin and/or generic doxycycline sold in the United States.  These activities included the following:

      a.     Defendants participated in meetings and/or conversations to discuss the price of generic digoxin and/or generic doxycycline in the United States;

      b.     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic digoxin and/or generic doxycycline sold in the United States;

      c.     Defendants agreed during those meetings and conversations to fix the price of generic digoxin and/or generic doxycycline; and

      d.     Defendants issued price announcements and price quotations in accordance with their agreements.

Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in the Complaint.

115.     During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Class purchased generic digoxin and/or generic doxycycline from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

116.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 of the Sherman Act (15 U.S.C. § 1) and the laws of various states.

117.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the class have been injured in their business and property in that they have paid more for generic digoxin and/or generic doxycycline than they would have paid in a competitive market.

118.    The unlawful contract, combination or conspiracy has had the following effects, among others:

        a.      price competition in the market for generic digoxin and generic doxycycline has been artificially restrained;

        b.      prices for generic digoxin and/or generic doxycycline sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

        c.      purchasers of generic digoxin and/or generic doxycycline from the Defendants have been deprived of the benefit of free and open competition in the market for generic digoxin and generic doxycycline.

## CLASS ACTION ALLEGATIONS

119.    Plaintiff brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

        All persons and entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic digoxin or generic doxycycline products from October 1, 2012 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal

and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic digoxin or doxycycline products for purposes of resale or directly from Defendants;  (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic digoxin or doxycycline products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

120.    Plaintiff also brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states listed below (the "Indirect Purchaser States")[63] on behalf of the following class (the "Damages Class"):

> All persons and entities in the Indirect Purchaser States who purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic digoxin or generic doxycycline products from October 1, 2012 through the present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic digoxin or doxycycline products for purposes of resale or directly from Defendants;  (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic digoxin or doxycycline products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; and (f) any judges or justices involved in this action and any members of their immediate families.

---

[63] The "Indirect Purchaser States" consist of Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

.

121.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

122.    While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are millions of members in each Class.

123.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

> a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic digoxin and/or generic doxycycline and/or engaged in market allocation for generic digoxin and/or generic doxycycline sold by prescription in the United States;
>
> b.    The identity of the participants of the alleged conspiracy;
>
> c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> d.    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;
>
> e.    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;
>
> f.    Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;
>
> g.    Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;

      h.     The effect of the alleged conspiracy on the prices of
Generic digoxin and generic doxycycline sold in the United
States during the Class Period;

      i.     The appropriate injunctive and related equitable relief for
the Nationwide Class; and

      j.     The appropriate class-wide measure of damages for the
Damages Class.

124. Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic digoxin and generic doxycycline purchased indirectly from the Defendants and/or their co-conspirators.

125. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

126. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

127. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress

for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

128.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## FIRST COUNT
### Violation of Section 1 and 3 of the Sherman Act
### (on behalf of Plaintiff and the Nationwide Class)

129.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

130.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3).

131.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

132.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic digoxin and doxycycline, thereby creating anticompetitive effects.

133.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic digoxin and generic doxycycline.

134.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic digoxin and generic doxycycline have been harmed by being forced to pay inflated, supracompetitive prices for generic digoxin and generic doxycycline.

135.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

136.    Defendants' conspiracy had the following effects, among others:

   a.    Price competition in the market for generic digoxin and generic doxycycline has been restrained, suppressed, and/or eliminated in the United States

   b.    Prices for generic digoxin and generic doxycycline provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

   c.    Plaintiff and members of the Nationwide Class who purchased generic digoxin and generic doxycycline indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

137.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic digoxin and generic doxycycline purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

138.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

139.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND COUNT
### Violation of State Antitrust Statutes
### (on behalf of Plaintiff and the Damages Class)

140.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

52

141.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic digoxin and generic doxycycline in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

142.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic digoxin and generic doxycycline and to allocate customers for generic digoxin and generic doxycycline in the United States.

143.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic digoxin and generic doxycycline at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic digoxin and generic doxycycline provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

144.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic digoxin and generic doxycycline.

145.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

53

146.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Arizona; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code § 6-6-60, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Alabama Code § 6-6-60, *et seq*..

147.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) price competition for generic digoxin and generic doxycycline was restrained, suppressed, and eliminated throughout Arizona; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a

direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

148.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code Section §16720.  Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of generic digoxin and generic doxycycline at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic digoxin and generic doxycycline. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic digoxin and generic doxycycline. The combination and conspiracy alleged herein has had, *inter alia*, the following effects:  (1) price competition for generic digoxin and generic doxycycline has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic digoxin and generic doxycycline  provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive

levels in the State of California and throughout the United States; and (3) those who purchased generic digoxin and generic doxycycline directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

149.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, *et seq.* Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic digoxin and generic doxycycline that were shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic digoxin and generic doxycycline in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District

of Columbia commerce. As a direct and proximate result of defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

150. Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

151. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants'

combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*

Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553, *et seq.*

153.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, *et seq.* Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

154.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*) Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid

supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

155. Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline.

During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

158.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

159.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

160.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New

Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

161.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

162.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq*. Defendants' combinations or

conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline that were higher than they would have been absent the Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a *per se* violation of the Act.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected North

Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

164.   Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

165.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Defendants' combinations or

conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

166. Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are

threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

167.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.* Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

168.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic digoxin and

68

generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

169.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.* Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of

Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

170.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.* Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

171.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq.* Defendants' combinations or conspiracies had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free

and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*.  Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

172.    Plaintiff and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiff and members of the Damages Class have paid more for generic digoxin and generic doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

173.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiff and members of the Damages Class.

174.    Accordingly, Plaintiff and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT
### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiff and the Damages Class)

175.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

176.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

177.     Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et. seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and

are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

178.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*.   During the Class Period, Defendants manufactured, marketed, sold, or distributed generic digoxin and generic doxycycline in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair,

unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic digoxin and generic doxycycline in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic digoxin and generic doxycycline.  Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

179.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing,

controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.  Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they was being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic digoxin and generic doxycycline. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price.  Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic digoxin and generic doxycycline because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic digoxin and generic doxycycline, including their illegal conspiracy to secretly fix the price of generic digoxin and generic doxycycline at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class.  The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic digoxin and generic doxycycline. Defendants' unlawful conduct had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at

artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

180.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*. Defendants' unlawful conduct had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

181.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*. Defendants' unlawful conduct had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

182.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq*.  Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices

in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute, including multiple damages.

183.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.* Plaintiff and members of the Damages Class purchased generic digoxin and generic doxycycline for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic digoxin and generic doxycycline in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Missouri, which conduct

constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic digoxin and generic doxycycline.  The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of generic digoxin and generic doxycycline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic digoxin and generic doxycycline by making public statements that were not in accord with the facts.  Defendants' statements and conduct concerning the price of generic digoxin and generic doxycycline were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing generic digoxin and generic doxycycline at prices established by a free and fair market. Defendants' unlawful conduct had the following effects:   (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.  As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available

under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

184.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.* Defendants' unlawful conduct had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Montana; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic digoxin and generic doxycycline in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

185.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and members of the Damages Class and the prices paid by them for generic digoxin and generic doxycycline as set forth in N.M.S.A., § 57-12-2E.   Plaintiff and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generic digoxin and generic doxycycline.  Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price.   Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing generic digoxin and generic doxycycline because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and members of the Damages Class could avoid the overcharges.  Defendants' conduct with regard to sales of generic digoxin and generic doxycycline, including their illegal conspiracy to secretly fix the price of generic digoxin and generic doxycycline at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public.

Defendants took grossly unfair advantage of Plaintiff and members of the Damages Class.  The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic digoxin and generic doxycycline. Defendants' unlawful conduct had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

186.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic digoxin and generic doxycycline

that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic digoxin and generic doxycycline; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic digoxin and generic doxycycline were misled to believe that they were paying a fair price for generic digoxin and generic doxycycline or the price increases for generic digoxin and generic doxycycline were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic digoxin and generic doxycycline would have an impact on New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic digoxin and generic doxycycline would have a broad impact, causing consumer class members who indirectly purchased generic digoxin and generic doxycycline to be injured by paying more for generic digoxin and generic doxycycline than they would have paid in the absence of Defendants' unlawful trade acts and practices.  The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects:   (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class

were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic digoxin and generic doxycycline in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic digoxin and generic doxycycline in New York. Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

187.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy.  Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Damages Class could not possibly have been aware.  Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases.  Defendants' public statements concerning the price of generic digoxin and generic doxycycline created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not

to divulge the existence of the conspiracy to outsiders. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.   Defendants' unlawful conduct had the following effects:  (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants marketed, sold, or distributed generic digoxin and generic doxycycline in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic digoxin and generic doxycycline in North Carolina. Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

188.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer

Protection Act (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*) Members of this Damages Class purchased generic digoxin and generic doxycycline for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic digoxin and generic doxycycline. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic digoxin and generic doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects:  (1) generic digoxin and generic doxycycline price  competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic digoxin and generic

doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic digoxin and generic doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of generic digoxin and generic doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

189.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq*.) Defendants' combinations or conspiracies had the following effects: (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq*., and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

190.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic digoxin and generic doxycycline were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic digoxin and generic doxycycline. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic digoxin and generic doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects:   (1) generic digoxin and generic doxycycline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic digoxin and generic doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for generic digoxin and generic doxycycline. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic digoxin and generic doxycycline, likely misled all purchasers acting

reasonably under the circumstances to believe that they were purchasing generic digoxin and generic doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

### FOURTH COUNT
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

191.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

192.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic digoxin and generic doxycycline.

193.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and members of the Damages Class for generic digoxin and generic doxycycline manufactured by Defendants during the Class Period.

194.    Plaintiff and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and members of the Damages Class may make claims on a *pro rata* basis

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment that:

1.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a *per se* violation of Section 1 of the Sherman Act; (c) An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) Acts of unjust enrichment by Defendants as set forth herein.

3.     Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.     Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a

similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiff and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

7.      Plaintiff and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiff and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiff and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: June 17, 2016                        Respectfully submitted,

By: _____
    Krishna B. Narine
    Joel C. Meredith
    **MEREDITH & NARINE**
    100 S. Broad St.
    Suite 905
    Philadelphia, PA 19110
    Telephone: 215-564-5182
    Facsimile: 267-687-1628
    knarine@m-npartners.com
    jmeredith@m-npartners.com

Guido Saveri (22349)
R. Alexander Saveri (173102)
Lisa Saveri (112043)
Cadio Zirpoli (179108)
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
guido@saveri.com
rick@saveri.com
lisa@saveri.com
cadio@saveri.com

E. Kirk Wood
**WOOD LAW FIRM, LLC**
P. O. Box 382434
Birmingham, Alabama 35238-2434
Telephone:  (205) 612-0243
Facsimile: (866) 747-3905
ekirkwood1@bellsouth.net

Robert M. Foote
Kathleen C. Chavez
**FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC**
10 West State Street
Suite #200
Geneva, Illinois 60134
Telephone: (630) 232-7450
Facsimile: (630) 232-7452
rmf@fmcolaw.com
kcc@fmcolaw.com

Gerald J. Rodos
Jeffrey B. Gittleman
Chad A. Carder
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Telephone: (215) 963-0600
Facsimile:  (215) 963-0838
GRodos@barrack.com
JGittleman@barrack.com
Ccarder@barrack.com

*Counsel for Plaintiff*